## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michelle A. Smith,                                  Case No. 0:20-cv-00498 (KMM/DTS)

        Plaintiff,

v.

                                **ORDER**

Louis DeJoy, U.S. Postmaster General,
in his official capacity; United States
Postal Service,

        Defendants.

Plaintiff Michelle Smith brought this case against U.S. Postmaster General Louis DeJoy, in his official capacity, and the United States Postal Service ("USPS"), alleging employment discrimination based on race, under Title VII of the Civil Rights Act of 1964. [ECF 58.]  Ms. Smith specifically asserts that she was subjected to a racially hostile work environment while working for USPS.  Before the Court are the defendants' motion for summary judgment and Ms. Smith's motion to supplement the record.  [ECF 91 (Mot. for Summ. J.), 105 (Mot. to Suppl.).]  The defendants' motion is GRANTED, and the Plaintiff's motion is GRANTED.

### I.      Background

Ms. Smith is an African-American woman.  [Dube Decl. Ex. C – Deposition of Michelle Smith ("M. Smith Dep."), 29:24–25, ECF 97-1.]  She began her career with the USPS as a mail carrier at its location in Oak Park Heights, Minnesota ("OPH"). [*Id.* at 21:1–6.]  Her husband, Steve Smith, worked at the same location.  [*Id.* at 23–25.]  Mr.

Smith is also African-American. [*Id.* at 212:2–3.] Ms. Smith asserts that she and her husband experienced racial harassment and discrimination at OPH. Mr. Smith filed a complaint with the EEOC while at OPH and his case is still pending. [*Id.* at 22:8–10; Dube Decl. Ex. D – Deposition of Steve Smith ("S. Smith Dep.") 28:16–22, ECF 97-1.] In December 2016 and January 2017, Ms. Smith and her husband were transferred to the Postal Service's Processing and Distribution Center in St. Paul, Minnesota ("SPDC"). [M. Smith Dep. at 20:13–15, 28:19–20.] Although her lawsuit arose while she was working at the St. Paul facility, Ms. Smith points to events that occurred at both locations in support of the claim that she was subject to a hostile work environment.

Both sides in this litigation characterize the record in their briefing in a way that supports their respective narratives. However, the following summary of the relevant facts – and the Court's summary judgment analysis itself – focuses on the actual evidentiary record before the Court rather than on the arguments or characterizations offered by either side. Additionally, as explored below, conduct that was not directed toward Ms. Smith, conduct that was overheard or learned about later, and incidents that are not expressly racist in nature – while certainly upsetting to Ms. Smith and her husband – are less critical to the Court's analysis regarding the presence of a hostile work environment than other allegations.[1] Nonetheless, as the law requires, the Court both examines the record and

---

[1] As the Court explains below, conduct need not be explicitly racist at every turn to be based on race, but there does need to be sufficient evidence to support the allegation that the harassment was based on the plaintiff's race. *See Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 541 (8th Cir. 2014) (affirming summary judgment where the plaintiff did not support her allegations with sufficient evidence and relied mostly on speculation and conjecture to show that the alleged harassment was race based).

frames the following summary by viewing the evidence in the light most favorable to Ms. Smith because she is the non-moving party.

## A.  Behavior Directed at Ms. Smith

The Court first outlines the conduct that Ms. Smith herself experienced, as that is most central to the required analysis.  The behavior directed to Ms. Smith can be placed in two categories: (1) behavior that may have been influenced by race but could have been influenced by other things as well; and (2) behavior that had overtly racial overtones, and is therefore most relevant to this case.  The vast majority of the hostility experienced by Ms. Smith came from a single coworker, Ann Ziemer.  Throughout her employment at SPDC, Ziemer is alleged to have engaged in inappropriate conduct toward the Smiths, starting immediately upon Ms. Smith's arrival at the SPDC facility and continuing, at times intermittently, for several years.

### 1.  General Misbehavior by Ziemer

From almost the beginning of her assignment to the St. Paul facility, Ziemer harassed Ms. Smith.  For instance, Ms. Smith testified that Ziemer frequently followed Ms. Smith around their workplace while taking notes and told other employees about the Smiths' experiences at OPH.  [M. Smith Dep. at 63:20–25, 68:18–21, 84:9–18; S. Smith Dep. at 58:1–7.]  Ms. Smith reported this behavior to management.  [M. Smith Dep. 59:4–21, 60:2–20.]  When Ms. Smith asked Ziemer to stop following her and her husband, Ziemer responded by screaming and yelling at Ms. Smith which was confirmed by another employee.  [S. Smith Dep. at 61:5–13; Dube Decl. Ex. T – IMIP Report at 3–4, ECF 97-2.]  Ms. Smith reported this incident to management; Ziemer denied yelling and claimed

Ms. Smith was the one who yelled. [IMIP Report at 2.] Ziemer was not disciplined on this occasion. [*Id.*] Ms. Smith asserts that Ziemer called her "wife" and "wifey." Ziemer testified that she has never called Ms. Smith "wife" or wifey." [Ziemer Dep. at 82:8–13.] When shown written statements contradicting this, Ziemer explained that she did refer to Ms. Smith as "wife" in written reports and that it was okay to do so because the reports were private. [*Id.* at 87:18–23, 89:11–20.] Ms. Smith also testified that on one occasion in March of 2017, Ziemer waited for the Smiths in the SPDC parking lot and followed them home. [M. Smith Dep. at 79:7–25, 80:1–5.]

In April of 2017, Ms. Smith observed Ziemer parked outside the Smiths' home, although Ziemer denied having been there. [M. Smith Dep. at 88, 90; Dube Decl. Ex A – Deposition of Ann Ziemer ("Ziemer Dep."), 152:13–19, ECF 97-1; IMIP Report at 1–2.] Ms. Smith reported this to management, and there is a dispute about whether they told her that they would decide about police involvement, [M. Smith Dep. at 92], or that she should call the police because the incident occurred off-site [Hoskins Decl. Ex. C – EEO Investigative Affidavit, ECF 95-3]. In either case, the police were not called, but the Smiths moved homes after this incident because Ms. Smith no longer felt safe. [M. Smith Dep. at 192, 193; S. Smith Dep. 82, 83.] Later in April, Ziemer tried to get the Smiths to walk in front of her car. [Dube Decl. Ex. V – EEO Investigative Report, at 2–3, ECF 97-2.]

Also in April, Ziemer moved Ms. Smith's assigned cleaning supplies. [M. Smith Dep. at 97:20–98:18.] After her mop had been moved, Ms. Smith went to her supervisor, Jeffrey Thurston, to have him unlock the check-in/check-out cage so she could address the

4

issue, which he did. [Hoskins Decl. Ex. F – Deposition of Jeffrey Thurston ("Thurston Dep."), 148:2-10, ECF 95-6.] Thurston then directly asked Ziemer about moving the mop, and Ziemer admitted that she did it, but claimed that it was dirty and unsafe to leave a soiled mop in the hallway outside the break area. [*Id.* at 146:5–20.] Thurston informed Ziemer that she was not responsible for other employees' equipment, and that she was not allowed to move or return equipment that other employees were using. [Hoskins Decl. Ex. G – EEO Investigative Affidavit, at ¶ 13, ECF 95-7.]

A few days after those incidents, Thurston gave a "service talk" to staff in an effort to improve the situation among the employees. [*Id.* at ¶ 17.] Manager Matthew Nelson had requested that Thurston give a talk on "dignity and respect" in the workplace. [Hoskins Decl. Ex. H – Deposition of Matthew Nelson ("Nelson Dep."), 188:17–189:17, ECF 95-8.] During this session, all employees were told to stay in their assigned work areas and to leave other employees' equipment alone during breaks. [EEO Investigative Affidavit at ¶ 17.] Given the ongoing conflicts between the parties, the Smiths and Ziemer were specifically told to have no interaction with each other when possible, and only very limited interaction if needed. [*Id.*] Also, in response to the Smiths' complaints about Ziemer, on May 22, 2017, they were given separate break times to avoid overlapping with her, so that there would not be additional conflict. [Nelson Dep. at 201:22–202:2; Hoskins Decl. Ex. I – Deposition of Jennifer Fisher ("Fisher Dep."), 178:18–179:13, ECF 95-9.] Under the revised break time schedule, the Smiths would not have breaks or lunch at the same time as Ziemer. [*Id.*]

According to Ms. Smith, Ziemer's problematic behavior continued despite the service talk and for a long time after she filed her EEOC complaint in April of that year. For instance, Ziemer filed a false report with management accusing the Smiths of inappropriate physical contact at work. [M. Smith Dep. at 117; Declaration of Steve Smith ("S. Smith Decl."), at 2, ECF 110.] And the Smiths testified that Ziemer took photos of them without permission. [M. Smith Dep. at 119, 120; S. Smith Dep. at 141:23–25.] On one occasion, Ziemer also allegedly blocked the Smiths' car, wrote down their license plate, and called the police on Mr. Smith when he asked what she was doing. [M. Smith Dep. 128:10–20; Declaration of Michelle Smith ("M. Smith Decl."), at 2, ECF 109.] Indeed, Ms. Smith testified in her depositions that Ziemer's misconduct continued off and on for years, with an incident occurring as late as April 2021. However, the record regarding the alleged misconduct is most detailed for the incidents that occurred prior to Ms. Smith's EEOC filing in late April 2017.

Ziemer was disciplined for some of this conduct. For instance, Ziemer received a Letter of Warning for bothering the Smiths in July 2017. And for incidents that occurred in the fall of 2017, she received a seven-day suspension in 2018. [Dube Decl. Ex. F – Ziemer's Grievance Summary, ECF 97-1.] She may have been subject to additional suspensions as well, though the record is somewhat unclear on this point. It appears that she was also subjected to emergency discipline in 2019, after she was violent and aggressive towards a member of management. [Dube Decl. Ex. G – Krien Incident Report at 1–2, ECF 97-1.]

### 2.  Overtly Racial Behavior

Ms. Smith alleges that Ziemer's conduct was not only improper, but also racist.  She testified that over the years of working together, Ziemer called her and her husband "shit skin," "baby shit skin," twice called her "jigaboo," referred to her as "them," and "it," was once overheard saying she would not eat "Black food," and has spoken to Ms. Smith twice in a blackface Sambo voice, stating "I know how to write, ha-ha," and "I look prettier than you, ha-ha."  [M. Smith Dep. at 76, 153:13–24, 155:19, 158:4–7, 164:16–19; M. Smith Decl. at 2; S. Smith Dep. at 92:11–93:13.]  Ms. Smith also alleges that Ziemer made gorilla and monkey noises toward her.  [M. Smith Dep. at 48:8–22.]  It appears that the incidents involving racist comments reportedly made by Ziemer occurred over a period of several years after the EEOC complaint, and therefore were not reported to or investigated by the EEOC.  In addition, the record contains evidence of one of the Smiths reporting Ziemer to a supervisor for using racially offensive language on one occasion, but there are few mentions aside from the Smiths' testimony that Ziemer's racist language was reported to USPS management.

### B.  Behavior Directed at Mr. Smith

Ms. Smith also points to evidence of racist behavior directed at her husband in support of her hostile-work-environment claim.  For instance, in May 2016, while still working at OPH, Mr. Smith asked Postmaster Terry Hjelmgren about being promoted, and Hjelmgren allegedly told him that was not going to happen because Mr. Smith was Black, and the post office was run by the "good old boys."  [S. Smith Dep. at 23:9–18.] Additionally, Hjelmgren and Tommy Klein, a postal clerk, allegedly referred to Mr. Smith

as "Monkey Man." [*Id.* at 24:12–17.] At some time at OPH, a picture of a gorilla was placed on the workroom floor, and Char Wilson, a supervisor, purportedly said it looked like Mr. Smith. [*Id.* at 21:15–23.] Ms. Smith also allegedly overheard Klein say he could not wait until the Smiths "were gone like the Obamas," because he was "trying to clean the place up." [M. Smith Dep. at 29:18–22.]

At SPDC, Ziemer made a comment about Steve "acting Black," falsely accused Mr. Smith of keying her car, called the police on him, and rubbed up against him, and followed Mr. Smith at the facility and took a photograph of him. [S. Smith Dep. at 85:6–12, 123:4–15; M. Smith Dep. at 119:3–6.] Ms. Smith also emphasizes an incident at SPDC where another Black employee left a derogatory note on Mr. Smith's toolbox that said "Caution: Dead Laker's N----r Storage Ahead." [S. Smith Dep. at 108:18–23.]

**C. EEOC Complaint and Lawsuit**

In April 2017, Ms. Smith filed a formal EEOC complaint, alleging that the USPS discriminated against her based on her race and color. [Dube Decl. Ex. W – M. Smith EEO Complaint, ECF 97-2.] Although the complaint included several incidents which had occurred while she worked at OPH, the EEOC dismissed the earlier claims and accepted for investigation claims from February through April 2017, all of which occurred at SPDC. [Hoskins Decl. Ex. J – U.S. Postal Service EEO's Partial Acceptance/Partial Dismissal of Formal EEO Complaint ("EEO's Partial Acceptance/Partial Dismissal of Complaint"), ECF 95-10.]

In her EEOC complaint, Ms. Smith identified Ziemer as the only individual from SPDC who had discriminated against her, and all of the incidents described involved

Ziemer.  [*Id.*]  Overall, she alleged that Ziemer "made it a toxic environment for everyone at the Eagan Plant in St. Paul."  [*Id.*]  Although Ms. Smith outlined many specific incidents of harassment and misbehavior by Ziemer, she did not describe any use of racial slurs or racist language during those incidents.  [M. Smith EEO Complaint.]  In her EEOC complaint, Ms. Smith explained that she thought her race and color were factors in the way Ziemer treated her both because Ziemer did not know her and due to how the harassment made her feel.  [M. Smith Dep. at 70:16–25.]

In the end, the EEOC partially accepted and partially denied Ms. Smith's complaint. [EEO's Partial Acceptance/Partial Dismissal of Complaint.]  On February 12, 2020, Ms. Smith commenced this action against Defendants U.S. Postmaster General Louis DeJoy, in his official capacity, and the United States Postal Service ("USPS"), for employment discrimination based on race, under Title VII of the Civil Rights Act of 1964. She filed an Amended Complaint on December 14, 2020.  [Third Am. Compl., ECF 58.] The Defendants now move for summary judgment.  Ms. Smith moves to supplement the record.

## II.   Discussion

As explored below, the applicable law sets a high bar for when a work place is such a racially hostile environment as to support a claim for discrimination.  Harassment must be sustained, severe, and based on someone's protected status.  The Court is sympathetic to Ms. Smith's experience, and particularly to the bizarre conduct directed at her and her spouse by Ziemer.  But, after careful analysis of controlling decisions from the Eighth Circuit Court of Appeals, the Court must conclude that the record in this case does not

demonstrate the sort of hostile work environment required to sustain a claim for racial harassment under Title VII. Summary judgment is appropriate.

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When the court assesses evidence before it on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The non-moving party may not rest on mere allegations but must produce significant probative evidence demonstrating that specific facts exist creating a genuine issue for trial.  *Id.* at 250.  Arguments and assertions made by counsel in briefs are not evidence.  *See Stringer v. St. James R-1 Sch. Dist.*, 446 F.3d 799, 804 (8th Cir. 2006).

### B.  Hostile Work Environment: A High Bar

"The standard for demonstrating a hostile work environment under Title VII is 'demanding.'"  *Mwassa v. Presbyterian Homes & Servs.*, Case No. 19-cv-01511 (SRN/HB), 2022 WL 658740, at *13 (D. Minn. March 4, 2022).  To establish a race-based hostile-work-environment claim, a plaintiff must show (1) she is a member of a protected group, (2) she was subjected to unwelcome race-based harassment, (3) the harassment was based on her membership in the protected group, and (4) the harassment affected a term, condition, or privilege of her employment.  *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 617–18 (8th Cir. 2007) (citing *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005)).  The fourth element of a hostile-work-environment claim requires a

plaintiff to demonstrate that the harassment she experienced "was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006) (citation omitted).  "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." *Id.* at 846.  Factors to consider include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Abdel-Ghani v. Target Corp.*, 686 F. App'x 377, 379 (8th Cir. 2017) (per curiam) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

In practice, this standard creates a high bar to prove "severe and pervasive" treatment in the Eighth Circuit.  In *Abdel-Ghani*, for example, the Eighth Circuit held that the following comments made by coworkers to a plaintiff, who was a Palestinian immigrant, were not sufficient to create a hostile work environment: (1) "go back home, to your country," (2) persistent name calling such as "camel jockey, Muslim, Arab, terrorist, and sand ni***r", and (3) "[y]ou should be rounded up in one place and nuke[d]."  686 F. App'x at 378.  The court reasoned that, while most of the comments were morally repulsive, they were not physically threatening.  *Id.* at 379.  Equally important, the only physically threatening comment that the plaintiff overheard was not directed at him.  *Id.*

Likewise, in *Smith v. Fairview Ridges Hospital*, the Eighth Circuit found that the plaintiff had not presented a triable hostile-work-environment claim although she presented evidence that coworkers told her to "go back to the ghetto," referred to her as a "runaway

slave," displayed t-shirts on a computer screen that included the n-word and commented that "black aides don't know what they're doing," among several other racial incidents and comments. 625 F.3d 1076, 1081–82, 1085–86 (8th Cir. 2010), *abrogated in part on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc). Similarly, in *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2009), the court found that sporadic racial slurs, occurring about once per month over two years, were not so severe or pervasive to alter the terms or conditions of employment.

Not only does the caselaw require a pervasive level of harassment to sustain a claim, but certain types of misconduct in the workplace setting carry less weight in this analysis. For example, Eighth Circuit precedent suggests that a hostile-work-environment plaintiff cannot avoid summary judgment by presenting evidence of incidents that are not tied to the plaintiff's race when non-minorities received similar treatment. *See Smith*, 625 F.3d at 1083 ("Several of the allegations made by Smith . . . at most only tenuously relate to race."); *Hawkins v. McDonoug*h, Case No. 20-001118-CV-W-BP, 2021 WL 5514004, at *11 (W.D. Mo. Aug. 24, 2021) ("[T]he Record is replete with evidence that other individuals who were members of different categories suffered the same treatment."). Similarly, when the evidence shows that the challenged conduct was not directed at the plaintiff, the defendant may be entitled to summary judgment. *See Molone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011) (affirming summary judgment where some of the incidents were not directed at the plaintiff and others occurred outside of the plaintiff's presence); *see also Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 800 (8th Cir. 2021) (holding that the plaintiff's allegations, though "perhaps describing vile or inappropriate behavior,"

did not rise to the level of an actionable hostile work environment where "many of the incidents were not directed at her").

## C. Analysis

Ms. Smith describes a toxic work environment at both the Oak Park Heights facility and the SPDC. However, even focusing on the evidence in the record highlighted by Ms. Smith and drawing all permissible inferences in her favor, the documented conduct does not rise to the level required to survive summary judgment under the controlling authority in this Circuit.

### 1. Two Separate Work Environments

As a preliminary matter, the defendants argue that Ms. Smith is barred from alleging discriminatory conduct at the OPH facility in this lawsuit because claims related to her first work site were not properly exhausted before the EEOC. *See, e.g.*, *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) (explaining that, as a general matter, a plaintiff must fully exhaust her administrative remedies before a federal court may hear her discrimination claims). The Court disagrees that such a blanket prohibition applies. Defendants have not shown that, as a matter of law, Ms. Smith's first worksite has no bearing whatsoever on the decision now before the Court. But the Court is equally unconvinced by Ms. Smith's suggestion that Judge Nelson's earlier ruling on the Defendants' motion to dismiss definitively established that everything that occurred at the OPH facility is relevant for purposes of summary judgment. Instead, the question of when and to what extent events that occurred at a different worksite matter depends on various factors.

First, the Court finds no per se exhaustion-related barrier to consideration of events from OPH.  To exhaust her administrative remedies, a plaintiff must first "initiate contact" with an EEOC counselor "within 45 days of the date of the matter alleged to be discriminatory" or on the effective date of the alleged discriminatory personnel action," *Burkett*, 327 F.3d at 660 (quoting 29 C.F.R. § 1614.105(a)(1)), and it is true that the EEOC complaint was not filed in time for much of the conduct at OPH to be timely on its own. However, the U.S. Supreme Court has held that a plaintiff may recover for acts that occur outside the statutory period if at least one act occurred within the statutory period and the earlier acts were part of the same hostile work environment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  The Court explained that hostile environment claims, by their very nature, involve repeated conduct, and that such claims are based on the cumulative effect of individual acts.  *Id.* at 115.  So the question becomes whether the "unexhausted claims" are closely enough related to the exhausted one as to constitute a continuous basis for relief under the law.

In the Eighth Circuit, an employee's lawsuit need not "mirror the administrative charges" but "the sweep of any subsequent judicial complaint may be only as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination."  *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)) (cleaned up).  In determining whether a hostile-work-environment claim is timely, the Court must consider "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether *any*

14

act falls within the statutory time period." *Rowe v. Hussmann Corp.*, 381 F.3d 775, 779 (8th Cir. 2004) (quoting *Morgan*, 536 U.S. at 120 (emphasis added).

Here, the statutory period was December 7, 2016 (45 days prior to Ms. Smith's EEO counselor contact) to April 30, 2017 (the date of Ms. Smith's EEO complaint). During some of this time, Ms. Smith still worked at OPH before USPS transferred her to the St. Paul facility. Thus, the Court finds that Ms. Smith's OPH claims are not entirely barred from consideration.

However, the Court also concludes that the incidents described at the OPH facility are largely irrelevant to the Court's analysis because they involved different supervisors, a totally separate location, and different sorts of alleged misconduct.[2] The record demonstrates that Ms. Smith's managers at the two facilities were different, and there is no suggestion that the two facilities coordinated their response to Ms. Smith's allegations in any way. And the most egregious actor at the St. Paul facility, Ziemer, had nothing to do with any of the incidents at OPH, because her harassment of Ms. Smith only began after Ms. Smith transferred to the St. Paul facility. *Wilson v. Potter*, Nos. 4:04CV00086-WRW, 4:05CV00887-WRW, 2006 WL 2504312, at *6 (E.D. Ark. Aug. 29, 2006) ("The continuity of a hostile work environment claim may be destroyed . . . if the alleged conduct involves different supervisors and co-workers in different offices."); *see also Costanzo v. United*

---

[2] In an effort to overcome the reality that different supervisors were involved at the two distinct work sites, Ms. Smith attempts to draw personal connections between the management at the St. Paul facility and the OPH facility. However, those speculative connections are not borne out by the record, and are insufficient to demonstrate that a single management team was at work.

*States Postal Serv.*, Case No. 00 Civ. 5044(NRB), 2003 WL 1701998, at *11 (S.D.N.Y. March 31, 2003) (explaining that the plaintiff's working circumstances clearly changed after her transfer to a new team with a new direct supervisor).

Based on this jurisprudence, the Court concludes that the allegations from OPH, while not totally irrelevant as a matter of law, are much less salient to the claims before the Court than those that occurred at SPDC.

### 2.  Not Severe and Pervasive

Most critical to the Court's conclusion in this case is that under existing Eighth Circuit precedent, the evidence of racially harassing behavior would not permit a jury to find in favor of Ms. Smith's claim that her work environment was sufficiently "severe and pervasive." Certainly Ms. Smith's brief in opposition to summary judgment works hard to describe an intolerable environment. But a close examination of the evidentiary record before the Court reveals that the incidents at issue are both less severe and less pervasive than the threshold set forth in the caselaw. First, the Court cannot give substantial weight to statements or conduct that Ms. Smith heard about after they occurred, in contrast to incidents which were directed at her. *Abdel-Ghani*, 686 F. App'x at 379 (determining that the plaintiff could not show a hostile work environment where the one physically threatening comment he overheard—referencing being nuked—was not said directly to him). And the summary judgment record shows that Ms. Smith learned about some of the reported misconduct, such as the comment about not eating Black food, at some point after it occurred through a third party, in some instances even as late as after litigation had begun.

In addition, several of the incidents at the St. Paul facility were directed at Mr. Smith rather than Ms. Smith.  For instance, Ziemer directed the comment about Steve "acting Black" to *Steve*, falsely accused *Mr. Smith* of keying her car, called the police on him, and rubbed up against him.  [S. Smith Dep. at 85, 86, 122; M. Smith Dep. at 118, 119.]  And, though less relevant because it took place at OPH, a separate work site, Mr. Smith was the one who was told he would not be promoted because he was Black and the post office was run by the "good old boys."  Similarly, Mr. Smith was referred to as "Monkey Man," and had a supervisor say that a photo of him looked like a gorilla.  [S. Smith Dep. at 21, 23, 24; M. Smith Dep. at 208.]  While the Court finds that these incidents deserve somewhat greater weight in the analysis because they happened to Ms. Smith's own spouse than if they had occurred to an unrelated coworker, no case supports treating such comments and incidents on par with conduct directed at the plaintiff herself.  To the extent that these comments are actionable, they would be actionable by Mr. Smith, not by Ms. Smith on his behalf.

Even the comments directed at Ms. Smith directly do not meet the "severe and pervasive" standard.  First, Ms. Smith's brief and her deposition testimony point to a collection of incidents that span a period of several years; when examined against such a long period of time, the complained-of conduct is much less pervasive than if so many incidents were concentrated over just a few weeks or months.  Also, it is noteworthy that the racist comments are overwhelmingly attributed to a single coworker.  No other employee or supervisor at SPDC is alleged to have used such language or comments to Ms. Smith.  The Court also observes that these racial slurs and racist comments were not

part of the EEOC complaint, and are not mentioned in the Amended Complaint filed in this case, which included incidents as late as December 2019, though Ms. Smith testified about them in her deposition once litigation was underway. And even Ziemer's racist comments, while reprehensible, are not enough under the binding caselaw to create a hostile work environment. *Abdel-Ghani*, 686 F. App'x at 379; *Smith*, 625 F.3d at 1081–82, 1085–86. Even crediting Ms. Smith's memory in full and resolving any factual disputes in her favor at this stage – as the Court must – Ziemer used racially charged phrases or noises less than a dozen times during the many years of working with Ms. Smith. Such words are flatly unacceptable, but the Eighth Circuit has determined that their occasional use by a coworker, without more, is not enough to sustain a Title VII claim.

One incident highlighted by Ms. Smith bears specific mention. Ms. Smith describes a time at SPDC where another employee, also an employee of color, left a derogatory note on Mr. Smith's toolbox that said "Caution: Dead Laker's N----r Storage Ahead." [S. Smith Dep. at 108:18–23.] This note was in part a reference to Mr. Smith's known support of the Los Angeles Lakers, a loyalty his coworker did not share. Though appalling, this incident does not push the case into a truly hostile work environment. First, we note that it is unclear whether this incident was misguided ribbing, where one party believed it acceptable and the other found it entirely offensive. There is no other claim that this coworker was otherwise racist toward either of the Smiths, but the record does suggest both discord and a persistent rivalry between this person and Mr. Smith. While the Court shares Ms. Smith's indignation at the use of this racial slur, taken in the context in which it occurred, it does

18

not tip the record into a place where the Court can find a triable issue on her hostile-work-environment claim.

For the reasons stated above, Ms. Smith cannot establish that the conduct at the OPH and SPDC facilities were sufficiently severe or pervasive.

### 3. Race-Based Harassment

A final consideration influences the Court's conclusion about summary judgment in this case. The majority of misconduct highlighted by Ms. Smith and supported in the record comes from Ziemer, a single, seemingly uncontrollable coworker. While the alleged misconduct by Ziemer is appalling, the weight it plays in the Court's analysis is cabined in two ways. First, despite Ms. Smith's arguments to the contrary, the record does not support an inference Ziemer's behavior was primarily motivated by race. Certainly, conduct need not be explicitly racist at every turn to be based on race. But there does need to be sufficient evidence to support an inference that the harassment was based on the plaintiff's race. *See Clay*, 754 F.3d at 541. Here, the record shows that Ziemer was also awful to other coworkers who were white.[3]

Additionally, if a plaintiff brings a claim that is primarily based on co-worker harassment, she must also show that her employer knew or should have known about the co-worker's alleged harassment and that the employer failed to take adequate remedial measures to end the harassment. *Bowen v. Mo. Dept. of Social Serv.*, 311 F.3d 878, 883

---

[3] Ms. Smith argues that the other employees targeted by Ziemer were chosen because they were supporting the Smiths. [Plaintiff's Br. at 34; M. Smith Dep. at 72:6–13.] However, the record contains no evidence supporting such speculation.

(8th Cir. 2002).  Ms. Smith has not made such a showing in this case.  Instead, the record demonstrates that Ms. Smith and her husband complained repeatedly about Ziemer's behavior, and that several of those complaints led to investigations of Ziemer's conduct or disciplinary action.  Indeed, Ms. Smith alleges that Ziemer was suspended multiple times due to her treatment of them.  [Plaintiff's Br. at 4.]  But very few of the complaints raised by Ms. Smith or the records of Ziemer's discipline address the use of racist words or comments.[4]  No reasonable jury could conclude that the management at SPDC knew about and failed to correct persistent racist harassment on the record before the Court.

In sum, the work-environment described by Ms. Smith does not support a claim for a racially hostile work environment in light of the controlling Eighth Circuit authority.  For this reason, the Court grants summary judgment in favor of the defendant.[5]

---

[4] For instance, Jeffrey Thurston, one supervisor, testified that although he was aware of the stalking and harassing allegations regarding Ziemer, he had never received an allegation from an employee that Ziemer used racial slurs towards anyone, including the Smiths.  [Thurston Dep. at 123.]  However, on at least one occasion in October 2020, supervisor Matt Nelson acknowledged that Ms. Smith reported Ziemer referring to her as "shitskin" [Nelson Dep. at 6–20], and a copy of such a complaint is in the record.  [Dube Decl. Ex. U, M. Smith Handwritten Notes, ECF 97-2.]  Given management's response to complaints about Ziemer's behavior and its efforts to discipline her for misconduct, this complaint does not create a triable issue on Defendants' alleged failure to take adequate remedial measures to address her behavior.

[5] Ms. Smith also brought a motion to supplement the record with a declaration from her and a declaration from her husband.  The Court agrees that Ms. Smith did not show particularly good cause for failing to produce the supplemental declarations of her and her husband before the close of the summary-judgment briefing, which appears to have been an oversight.  But the Court also notes that the defendants fail to show prejudice from the requested amendment of the record.  Therefore, the Court will allow the supplemental declarations, and grants Ms. Smith's motion to supplement the record.  However, even considering the substance of the declarations, the Court has determined that they do not change the outcome of the defendants' motion for summary judgment.

**III.    Order**

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1.  Defendants' Motion for Summary Judgment [ECF 91] is **GRANTED**;
    and

2.  Plaintiff's Motion to Supplement the Record [ECF 105] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: March 20, 2023                                *s/Katherine Menendez*
                                                    Katherine Menendez
                                                    United States District Judge

21